**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

<u>Sarah Lane Brown</u>

    **v.**　　　　　　　　　　Case No. 14-cv-51-PB
　　　　　　　　　　　　　　Opinion No. 2014 DNH 242
<u>Carolyn W. Colvin,</u>
<u>Acting Commissioner,</u>
<u>Social Security Administration</u>

<u>**MEMORANDUM AND ORDER**</u>

Sarah Lane Brown seeks judicial review of a ruling by the Social Security Administration denying her application for disability insurance benefits ("DIB") and supplemental security income ("SSI").  For the reasons set forth below, I deny Brown's request and affirm the decision of the Commissioner.

**I.　　<u>BACKGROUND</u>**[1]

Brown applied for DIB and SSI on July 18, 2011.  At the time, she was 23 years old and working part-time at The Gap clothing store.  Brown alleges a disability onset date of June 12, 2011.  On that date, she went to the Portsmouth Regional Hospital Emergency Department because she was experiencing a manic episode.  She was diagnosed with bipolar I affective disorder and released from the hospital after seven days.  Brown

---

[1] The background is adapted from the parties' Joint Statement of Material Facts.  Doc. No. 15.

primarily contends that her disability stems from this condition as well as depression and borderline personality disorder.

**A.   Medical Evidence**

  1.   Barrington Family Practice

On May 25, 2011, Brown went to her primary care provider at Barrington Family Practice, complaining of depression and requesting medication. She reported that she was diagnosed with dysthymia[2] in high school, which worsened in college and has since been intermittent.  She was prescribed Celexa.[3]

  2.   Portsmouth Regional Hospital

On June 12, 2011, Brown went to the Portsmouth Regional Hospital Emergency Department because she was experiencing an episode of mania.  It was her first episode of mania and her first psychiatric hospitalization.  Her mother and stepfather brought her to the emergency room because she was talking incessantly, unable to sleep, feeling disoriented, and hypersexual.  Brown's physician diagnosed her with bipolar I affective disorder and noted that her mania was caused by Celexa.  She was prescribed Zyprexa,[4] Depakote,[5] and lorazepam.[6]

---

[2] Dysthymia is mild depression.  Dorland's Illustrated Medical Dictionary 582 (32d ed. 2012).

[3] Celexa is an antidepressant.  Dorland's, supra note 2, at 312, 366.

[4] Zyprexa is used for short-term treatment of manic episodes in

On June 19, 2011, Brown was discharged from the hospital. Upon discharge, her speech was normal and coherent.  Her thought process was logical, she had stopped talking about sex, and her behavior was appropriate.  Her affect was appropriate although unusually variable.  The physician at the hospital observed that Brown "may still be hypomanic, but overall she was feeling much better and she was discharged in stable condition."  Tr. at 360.

    2.   <u>Nurse Suellen Drake</u>

The record includes notes from five meetings Brown had with Nurse Suellen Drake during the summer and fall of 2011.  In June and July 2011, Brown reported to Nurse Drake that her appetite, sleep, and energy had been good.  In August, Brown reported that she had "been feeling less depressed" but had some increase in anxiety.  In September, Brown said she had "been feeling much better," had no side effects from medication, and her appetite, sleep, and energy were good.  Finally, in November, Brown reported that she had "not been feeling good," was "feeling depressed again," and was "working shifts and has questions

---

bipolar disorder.  <u>Dorland's</u>, <u>supra</u> note 2, at 1317, 2097.

[5] Depakote is used in the treatment of manic episodes in bipolar disorder.  <u>Dorland's</u>, <u>supra</u> note 2, at 490, 558.

[6] Lorazepam is used "in the treatment of anxiety disorders and short-term relief of anxiety symptoms and as a sedative-hypnotic agent."  <u>Dorland's</u>, <u>supra</u> note 2, at 1074.

about that."

3.    Psychologist Patricia Salt

On September 8, 2011, Patricia Salt, Ph.D., a non-examining state agency psychologist, reviewed the available evidence of record and completed a mental residual functional capacity ("RFC") assessment.  She opined that Brown appeared to meet Listing 12.04 for affective disorders of the Listing of Impairments, 20 C.F.R. pt. 404, subpt. P, app. 1.  She noted that Brown's impairment was severe at the time, but that she was new to treatment.  Based on Brown's "early pretty good response to medications," Dr. Salt did not expect Brown's condition to remain severe for twelve months.  Tr. at 82-83.

4.    Psychiatrist Paul Maguire and Therapist Susan Huebel

On July 19, 2011, therapist Susan Huebel of Community Partners completed an intake assessment of Brown.  Ms. Huebel recorded Brown's reported depressive symptoms, including low energy and motivation, insomnia to hypersomnia, lack of focus and concentration, anhedonia,[7] withdrawal and isolation, suicidal ideation and thoughts of self-harmful behaviors, self-denigrating thoughts, low self-esteem, and anxiety.  Ms. Huebel also observed that Brown was freshly showered, well-kept,

---

[7] Anhedonia is the total loss of feeling of pleasure in acts that normally give pleasure.  Dorland's, supra note 2, at 91.

4

cooperative, and talkative with "repetitive statements in a
circumstantial fashion at times."  She noted, however, that
Brown's speech was productive and logical, and she was able to
sit during the intake assessment and focus on the questions.
Ms. Huebel diagnosed Brown as having bipolar disorder and made a
provisional diagnosis of borderline personality disorder.

On August 9, 2011, psychiatrist Paul Maguire, M.D., also of
Community Partners, evaluated Brown.  During the evaluation,
Brown reported no difficulty academically, but "subjectively
report[ed] poor focus and difficulty with reading."  Tr. at 376.
She said "she had an outgoing personality and enjoyed being in
the theater," and reported a legal charge for petty theft, which
may have occurred "in the setting of hypomania prior to starting
Celexa."  Tr. at 376.  Brown said that her depressed episodes
tend to involve seasonal hypersomnolence[8] in the winter, low
self-esteem, lack of energy, weight gain, and thoughts of death,
but not suicidal behavior.

Dr. Maguire's treatment notes from August 9, 2011 indicate
that Brown was stable and not evidencing symptoms of mania.  He
also observed that she was appropriately dressed and groomed,
was calm, and made good eye contact.  Her speech had a normal

---

[8] Hypersomnolence is excessive sleeping or sleepiness.
Dorland's, supra note 2, at 896.

5

rate, volume, and tone.  Her thoughts were goal-directed, sequential, and on-topic.  She said that her mood was "[a] little depressed, a little anxious."  Tr. at 377.  Her affect was controlled.  She had good judgment related to her illness, self-care, and personal functioning.  Her attention and concentration were adequate for the interview.  He diagnosed her with bipolar mood disorder type I, "most recent episode severe, manic, with psychotic features, currently euthymic,"[9] and "[f]eatures of borderline personality disorder by history."  Tr. at 377.

On August 29, 2011, Dr. Maguire completed a mental impairment questionnaire based on his August 9, 2011 examination.  He observed that she was seated, calm, and cooperative; her speech had a normal rate, volume, and tone; her mood was a "little depressed, a little anxious"; her affect was controlled without lability; her content of thought had no abnormalities; and her sensory functions were "grossly intact." Tr. at 386.  Dr. Maguire opined that Brown had marked limitations in her task performance, stating that she had "poor ability to attend and concentrate."  Tr. at 387.  He also opined that she had moderate limitations regarding her reaction to stress, stating that she was easily overwhelmed and over-

_____

[9] Euthymia is a state of mental tranquility and well-being. Dorland's, supra note 2, at 655.

6

reactive.  He noted, however, that she was new to treatment.
Dr. Maguire also opined that Brown would be able to manage her
own benefits.  Dr. Maguire again listed his diagnostic
impressions as bipolar mood disorder type I, "most recent
episode manic, severe with psychotic features" and "[d]epressed,
features of Borderline Personality by history."  Tr. at 387.

On December 29, 2011, Brown began seeing Susan Huebel for
individual therapy approximately once a week.  Over the course
of the first month of therapy, Brown reported that she had been
terminated from work for shoplifting and that she was struggling
to appeal a denial of Social Security benefits.  She was
struggling from anxiety and relied on her mother for help with
keeping her Social Security paperwork organized.  On one
occasion, she discussed looking for work and engaging in healthy
activities.  She also reported disagreement with her roommate.

On January 31, 2012, Dr. Maguire completed an RFC
assessment of Brown.[10]  He opined that Brown was moderately
limited in understanding and memory activities, including the
ability to understand and remember simple or detailed
instructions.  He opined that she was markedly limited in most

---

[10] The parties state that Dr. Maguire also saw Brown on this
date.  Doc. No. 15 at 10.  It is not clear from the pages cited
that this is true.  The record also does not indicate whether
Dr. Maguire saw Brown between his initial August 9, 2011
examination and this date.  See Tr. at 397-400.

sustained concentration activities, such as maintaining a
routine without special supervision and completing a workweek
without psychological symptom disruption.  Similarly, he opined
that she was markedly limited in most social interaction
activities.  Finally, for adaptation activities, he opined that
her ability was mixed between moderate and marked limitation.

From February through June 2011, Brown met regularly with
Ms. Huebel and occasionally with Dr. Maguire.  Throughout
February, she reported depressive symptoms including low
motivation and energy.  By April, however, Brown stated that she
had "been doing very well" and "did not have distressing
symptoms related to her illness."  Tr. at 581.  Over the spring
and summer, Brown continued to report a generally stable mood,
but she also occasionally expressed anxiety and low motivation.

On June 28, 2012, Brown reported to Ms. Huebel that she had
recently been sexually assaulted.  She described having tension
in her chest, feeling numb, and occasionally dissociating.
Brown also reported increased anxiety and extreme fatigue.  Ms.
Huebel worked with Brown on various relaxation skills and Brown
stated that she was comfortable with her current support system.

On July 6, 2012, Brown reported to Ms. Huebel that she had
been "keeping busy with going out with her boyfriend to various
places" and had been exercising.  Tr. at 592.  She had some mild

8

illness-related symptoms such as interrupted sleep, some racing thoughts, nightmares on occasion, anxiety, negative thoughts, increased late night binge eating, and some irritability.  She was not interested in discussing the events of the sexual assault.

Three days later, on July 9, 2012, Brown's mother called Ms. Huebel to express concerns about Brown's behavior.  She stated that Brown had not been functioning as well as she could and had not been attending to her activities of daily living as well as she had in the recent past.  She told Ms. Huebel she noticed a decline in Brown's functioning since her "reported rape a few weeks ago" including "not answering her phone, not cleaning up after herself, isolating and withdrawing, and . . . exercising possible poor judgment."

On July 11, 2012, Brown saw Dr. Maguire.  Dr. Maguire noted that Brown was exercising regularly, including going to the gym and walking every day, and she was interested in obtaining a volunteer position.  He observed that she was seated, calm, cooperative, polite, and made good eye contact.  Her speech was spontaneous, with normal rate, volume, and tone.  Describing her mood, she said, "I feel really good."  Tr. at 633.

On July 12, 2012, Brown saw Ms. Huebel and reported feeling numb and struggling with her mood since her assault.  Ms. Huebel

9

noted that her affect was blunt and she appeared to be depressed.  A week later, Brown again met with Ms. Huebel and stated she was experiencing depressive symptoms with a lack of desire or energy to engage in pleasant events.  She reported that having a schedule and staying active helped and she noted that she was having her boyfriend and his friends over in the afternoon.

On July 26, 2012, Brown saw Ms. Huebel and discussed her plans to go hiking and camping with her boyfriend.  She declined to engage in trauma-related work, saying that she was "fine with this for now."  Tr. at 640.  She said she had been "sliding back a little bit" with her illness and lost some of her motivation to exercise, but she was looking forward to having a pleasant time with her boyfriend.  Ms. Huebel indicated that Brown had made some progress, noting that she "appears to be coming to terms with her illness."  Tr. at 640.

On August 2, 2012, Brown saw Ms. Huebel and reported that she was "doing well" and had an audition for a theater troupe. She reported feeling "kind of down today" but said she had been enjoying her time with her boyfriend.  She was keeping a vegan diet and blogging about her progress for motivation.  Ms. Huebel also informed Brown that they needed to complete therapy because Ms. Huebel was leaving her position.

On August 16, 2012, Brown met with Ms. Huebel.  She had
been evicted from her apartment for stealing alcohol and
marijuana from her neighbors.  She was "happy" about moving to a
new apartment, which provided more opportunity to participate in
community activities, and they discussed positive aspects of the
move, despite being evicted for stealing.  They discussed her
plans for the near future and her desire to get back on track
"financially and occupationally."  Tr. at 646.

On August 23, 2012, Brown had her last appointment with Ms.
Huebel.  They discussed her progress in therapy, her
impulsivity, and her plan to continue supportive services.  They
discussed her excitement about moving and her enjoyment of her
relationship with her boyfriend.

On September 12, 2012, Brown saw Dr. Maguire and reported
that she was "doing reasonably well."  Tr. at 648.  She said she
"still has some depression and anxiety but feels that it is much
improved."  Tr. at 648.  She was in the process of completing
her move, which caused her some anxiety.  Dr. Maguire noted,
"[o]verall she feels she is doing well."  Tr. at 648.  Dr.
Maguire observed that she was seated, calm, and cooperative, and
her thoughts were goal-directed, sequential, and on-topic.

5.   Case Managers Caitlin LeMay and David Kennedy

Beginning July 12, 2012, Brown met with a case manager once

11

a week.  For the first two months, Caitlin LeMay was her case
manager, but beginning in September 2012, David Kennedy became
her case manager.  Brown's case managers came to her house and
provided assistance with filling out paperwork and
organizational skills.

On August 9, 2012, Brown left a message for Ms. LeMay,
saying, "things have not been going as well as I've been
saying."  Tr. at 644.  She reported that she was being evicted
for stealing from a neighbor.  Ms. LeMay observed that Brown had
an "inappropriate affect in the message as she appeared bubbly
and happy with reporting this information."  Tr. at 644.  Ms.
LeMay called Brown, who reported experiencing impulsivity,
dissociations, hopelessness, and feeling down.  She explained
that she had stolen alcohol and marijuana from her neighbor.

On August 15, 2012, Brown met with Ms. LeMay.  Brown
reported concerns regarding "possible early warning signs," but
was not sure if they were signs of "mania/hypomania or
depression."  Tr. at 645.  She said that a couple of weeks ago,
she was "inconsistent" with her medication and believed this
might be the reason for her increase in symptoms.  Tr. at 645.

12

B.     **Non-Medical Evidence**

    1.    Brown's Function Report

On August 22, 2011, Brown completed a Function Report,
which she submitted to the Social Security Administration.  She
reported that she is easily overwhelmed and feels that working
part-time takes up all of her energy.  Before her illness, she
said she was able to work more hours than she can now.

    Brown reported that her daily activities included sleeping,
eating, and working part-time.  She also has a cat, which she
feeds.  She reported no problems with personal care such as
dressing and bathing, and she stated that she sets an alarm for
her medication twice a day.  She prepares her own meals, such as
frozen dinners or cereal, which takes no more than fifteen
minutes.  She reported cooking less than before her illness
began.  She also stated that she does laundry and some cleaning,
but needs encouragement from her mother.

    Brown stated that she goes outside daily and uses public
transportation, including taking the bus to work.  She grocery
shops once a week, which takes approximately forty-five minutes.
She can pay bills, count change, handle a savings account, and
use a checkbook.  Her daily hobbies include reading, watching
television, and drawing, which she reported doing "ok."  Tr. at
314.  She watches more television than before her illness

13

because she is less social now.  She reported that she does not frequently spend time with others and only occasionally receives calls.  Brown reported that she sometimes has problems getting along with friends because she is overwhelmed, but she is working on being social in therapy.  She said that she attends doctors' appointments weekly and needs someone to remind her and accompany her.

Brown stated that her illness affects her ability to talk, complete tasks, concentrate, follow instructions, and get along with others.  She elaborated that when talking to people, she gets nervous and stutters more than before her illness.  She said she cannot focus and gets distracted easily.  She has to read instructions several times and have spoken instructions repeated several times.

Brown reported that she gets along with authority figures "just fine."  Tr. at 316.  She said she had not been fired from a job for problems getting along with other people.  She said she handles stress and changes in routine "[n]ot well at all," saying she gets "anxious" from stress and "upset" from changes in routine.  Tr. at 316.  She said she had not noticed any unusual behavior or fears.  Regarding her medications, she noted that she was taking a Zyprexa and Prozac combination, which made her tired.

2.   Brown's Testimony

On October 16, 2012, Brown testified at a hearing with the ALJ.  Brown testified that she has bipolar disorder and features of borderline personality disorder.  In college, she was diagnosed with depression with psychotic features and put on Effexor.[11]  In her senior year of college, she failed a class because she was having trouble getting out of bed and she was diagnosed with depression and put on Effexor again.  She thought it made her "a little bit manic" because she cried and argued with her boyfriend a lot, but she did not attend counseling. Tr. at 43-44.  Although her grades went down a bit her senior year, she graduated in 2010 with a 3.25 grade point average. She earned a four-year degree in Technical Theater and Design, with an undeclared minor in psychology.

Brown testified that in June 2011, she had a manic episode and was hospitalized for seven days for bipolar disorder.  She said the manic episode lasted one-and-a-half to two weeks, and she had depression afterwards for two or three months.  In August 2012, she went to the emergency room because she was feeling suicidal, but had calmed down by the time she was released.  She said that when she is hypomanic, or even when she is not, her brain "goes too fast" and she forgets what she read

---

[11] Effexor is an anti-depressant.  Dorland's, supra note 2, at 595, 2046.

five minutes beforehand and has to re-read it.  Tr. at 64-65.

On a scale of one to ten, Brown said her depression reaches an eight a couple of times a month, even with medication.  She said she has a "really hard time with rainy days," and has trouble getting out of bed on a rainy day or a "bad day."  Tr. at 46-47.  On a bad day, she feels hopeless and depressed, feels like her brain "slows down" and she "can't process things," and is irritable.  Tr. at 46-47.  On days when she is depressed, she will feel really unmotivated, will not get up until 11:00 AM, and will use the bathroom and take her medication and then go back to bed, feeling tired.

She said the triggers for her depression include the weather, interpersonal relationship issues, and if she thinks someone is judging her. She said she does not get along well with other people.  For example, she said she used to become frustrated with her roommates if they did not do dishes or were rude, and would get "really agitated" and lock herself in her room.  Tr. at 55-56.  She said it was not difficult to be in the hearing because the ALJ was "friendly enough."  Tr. at 48.

With respect to her features of borderline personality disorder, she said that she "was having mood changes a lot faster than bipolar disorder usually does."  Tr. at 47.  She would have six mood changes in a day and had frequent mood

16

changes while working.  She said she would "ruminate about people's misgivings," and "see people very black and white." Tr. at 43, 47.  For example, if someone annoys her, "they're the devil," if not, she sees them "in a really good light."  Tr. at 47.  She said she has a tendency to mildly dissociate, where she "sort of blank[s] out" like she is "on auto drive," and does not remember what happened that day.  Tr. at 49, 68.

Brown said she also has anxiety, and has been prescribed Ativan[12] for it in the past.  When she has anxiety, her chest starts to tighten, and she will "really, really freak out."  Tr. at 50.  She said there is no particular trigger and it "just happens" once a week.  Tr. at 51.  She added that sometimes, such as when she moved, she "felt anxious pretty much every day."  Tr. at 51.

Brown testified that she is not currently working.  She said she looks for work "on good days, but it really depends on my mood."  Tr. at 39.  She previously worked in retail at The Gap for a couple of years, but was fired towards the end of 2011, when she had a manic episode and was caught stealing.  She also had a paid work-study position in college doing costume designs.  She receives food stamps and Medicaid.

---

[12] Ativan is a brand name for lorazepam, and is used for anxiety relief and as a sedative.  Dorland's, supra note 2, at 173, 1074.

Brown testified that she tries to clean her apartment, but often gets distracted while cleaning. She said she shops for food, but always has someone with her. She said she has a hard time with people in the grocery store because they are rude, which makes her upset and agitated. She said she rarely cooks, and eats things like a baguette with cheese, apples with peanut butter, or other foods from the refrigerator, and her mother makes her food to keep in the refrigerator. She takes the bus to counseling once a week, which takes forty-five minutes to an hour. She said she showers once or twice a week. She also has a cat, which she finds therapeutic. She said her hobbies include reading nonfiction, although she has a hard time focusing and has to reread passages and often gets frustrated and goes to bed. She goes to the gym with her mother once a week.

She uses a computer to access Microsoft Word and the Internet, uses websites such as YouTube and Facebook, and has several hundred Facebook friends. She also has an Android phone with Internet capacity. She has a driver's license, but does not own a car and has not driven since January or February, when her old car broke down.

Brown goes to the Tri-City Co-op, a peer support group for mental illness, three to four days a week. On days she goes to

18

the Co-op, she gets up at 9:00 AM, goes to the Co-op, goes home
for lunch, and then stays at the Co-op "until 2:00 or 3:00;
sometimes 5:00."  Tr. at 57-58.  At the Co-op, she goes to group
therapy sessions, talks with people, and takes art classes.
After leaving the co-op, she will eat something, read, or go
outside and walk around.  If she sees someone she knows, she
will spend time with that person until she gets aggravated.  She
said she is aggravated easily if someone is rude to her.  Two to
three times a week she takes a nap after leaving the Co-op.  On
days she does not go to the Co-op she is usually in bed, because
she is usually at home "on bad days, especially if the weather
is bad," which can happen up to three times a week.  Tr. at 64.
If the weather is good, she usually only stays home in bed all
day one day per week.

While working at The Gap, Brown testified that she was
sometimes too depressed to show up and she was easily frustrated
by customers.  She would swear under her breath, ruminate about
it, and not hide that she was upset.  She was warned by the head
of her store a couple of times.  She said she usually got along
with her co-workers, who were understanding, and her bosses, who
were polite.  She said the store was lenient with her, and if
she got distracted while doing her work, and did not finish
parts of it, they had someone else do it after her.  She said

19

she worked three to four days a week in 2011, often did not shower before work, and would be in bed when she was not at work. On the days she did not work, she spent all day in bed. She said she was late to work at least once a week, ranging from an hour to an hour-and-a-half late.

The ALJ asked Brown about the time she left a message with Community Partners saying that she was not doing as well as she had been reporting, was being evicted for stealing, and had been suicidal and gone to the hospital the evening before. Brown replied that, at the time she left the message, she thought her symptoms had been triggered by being assaulted and she was having more trouble with depression than she usually let on. She said "on days when I'm doing well, I feel like I've been doing well all along" and have "a hard time remembering, like, how bad it really was, so I usually underplay it." Tr. at 70. She said she had been having symptoms of mania and hypomania, and when she stole, she would get a "rush" and then "almost forget what happened." Tr. at 69-70. She said she had since stopped stealing. She said she had to move from living with roommates due to being evicted, but had also had trouble with her roommates before that.

Brown testified that she goes to counseling every week, a case manager visits her once a week, and she sees her prescriber

every three to four months.  She said she has a hard time keeping
appointments and a schedule, and has issues with follow-through
and focusing.  She said that her case manager helps her organize
her stuff, remember to file paperwork, and get through her daily
functions, such as cleaning.  She said she had a difficult time
filing the request for her hearing with the ALJ prior to having
case management.  She reported mistakenly believing that her
appeal for Medicaid was also an appeal for Social Security
benefits.  Her mother is very supportive and helps her clean and
keep her schedule, and often calls her to get her up in the
morning and remind her to take her medication.  She said her
mother helps her manage her money, but she has her own checking
account.

**C.   ALJ's Decision**

     The ALJ denied Brown's application in a decision dated
October 26, 2012.  The ALJ found that Brown had not engaged in
substantial gainful activity since June 12, 2011, and that her
bipolar disorder and features of borderline personality disorder
were severe.  The ALJ found that Brown has the RFC to perform a
full range of work at all exertional levels but with the
following non-exertional limitations: "the claimant is limited
to low stress jobs with rare interaction with the public, only
occasional interaction with co-workers, no tandem tasks, and

only occasional supervision. The claimant is further limited to semi-skilled or unskilled work with a specific vocational factor of 3 or below pursuant to the DOT." Tr. at 16. The ALJ added a footnote after low stress jobs, explaining that, "'[l]ow stress jobs' are defined as jobs that require only occasional decision-making and involve only occasional changes in the work setting." Tr. at 16.

The ALJ found that Brown is not able to perform any past relevant work, but determined that considering Brown's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that she can perform. Accordingly, the ALJ found that Brown was not disabled within the meaning of the Social Security Act from June 12, 2011, the alleged onset date of disability, through October 26, 2012, the date of the decision.

## II.   STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), I am authorized to review the pleadings submitted by the parties and the administrative record and enter a judgment affirming, modifying, or reversing the "final decision" of the Commissioner. My review "is limited to determining whether the ALJ used the proper legal standards and found facts [based] upon the proper quantum of evidence." Ward

v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000).

Findings of fact made by the ALJ are accorded deference as long

as they are supported by substantial evidence.  Id.  Substantial

evidence to support factual findings exists "'if a reasonable

mind, reviewing the evidence in the record as a whole, could

accept it as adequate to support his conclusion.'"  Irlanda

Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st

Cir. 1991) (per curiam) (quoting Rodriguez v. Sec'y of Health &

Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)).  If the

substantial evidence standard is met, factual findings are

conclusive even if the record "arguably could support a

different conclusion."  Id. at 770.  Findings are not

conclusive, however, if they are derived by "ignoring evidence,

misapplying the law, or judging matters entrusted to experts."

Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam).

The ALJ is responsible for determining issues of credibility and

for drawing inferences from evidence in the record.  Irlanda

Ortiz, 955 F.2d at 769.  It is the role of the ALJ, not the

court, to resolve conflicts in the evidence.  Id.


### III.   __ANALYSIS__

Brown primarily argues that the ALJ erred by failing to (1)

properly assess her credibility about "the intensity,

persistence and limiting effects" of her symptoms, and (2) assign appropriate weight to her treating psychiatrist's opinions. I address each argument in turn.

## A. __Brown's Statements Regarding Her Symptoms__

Brown argues that the ALJ erred in finding that her subjective reports of symptoms and functional limitations were not credible. "Because symptoms, such as pain, sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, any statements of the individual concerning his or her symptoms must be carefully considered . . . ." SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996); see also 20 C.F.R. § 404.1529(c)(3) (2014). A two-step analysis governs an ALJ's evaluation of symptoms. SSR 96-7p, 1996 WL 374186, at *2. First, the ALJ considers whether the claimant is suffering from "an underlying medically determinable physical or mental impairment[] . . . that could reasonably be expected to produce the individual's pain or other symptoms." Id. If the claimant meets that threshold, the ALJ moves to the second step:

> [T]he adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective

> medical evidence, the adjudicator must make a finding
> on the credibility of the individual's statements
> based on a consideration of the entire case record.

Id. That is, the ALJ must determine whether the claimant's
statements about her symptoms are substantiated by objective
medical evidence, and if not, the ALJ must consider other
relevant information to weigh the credibility of her statements.
See Guziewicz v. Astrue, 2011 DNH 010, 14. The ALJ's
credibility assessment of the claimant "is entitled to
deference, especially when supported by specific findings."
Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195
(1st Cir. 1987) (quoting DaRosa v. Sec'y of Health & Human
Servs., 803 F.2d 24, 26 (1st Cir. 1986)). This is because the
ALJ, not the reviewing court, "observed the claimant, evaluated
[her] demeanor, and considered how that testimony fit in with
the rest of the evidence . . . ." Id.

At step one, the ALJ found that Brown's medically
determinable impairments could reasonably be expected to cause
her alleged symptoms. At step two, however, the ALJ found her
statements regarding the intensity, persistence, and limiting
effects of her symptoms not credible to the extent they were
inconsistent with her RFC. Tr. at 17. Brown argues that the
ALJ "ignored" facts that support her statements and that he
"downplayed" her decline following a sexual assault. Doc. No. 7

at 7-9.  She accordingly believes that the ALJ's credibility determination is not supported by substantial evidence.  I disagree.

At the outset, I note that most aspects of Brown's statements are reflected in the ALJ's RFC determination.  For example, she said she experiences anxiety more often when she feels stressed; her RFC is only for "low stress jobs."  She reported anxiety and paranoia around others and said that she quickly judges people to be either "really great or terrible"; her RFC is limited to "rare interaction with the public," "only occasional interaction with co-workers," and "only occasional supervision."  Clearly, the ALJ credited many of Brown's statements and considered them in determining her RFC.

Nonetheless, Brown identifies one statement she made during the hearing that she feels the ALJ improperly ignored.  Specifically, she testified at the hearing that she has more trouble with depression than she reports to her providers.  Tr. at 70.  Effectively, Brown is arguing that the ALJ should have believed her hearing testimony over the treatment notes of her providers, because she was not fully forthcoming with her providers about her symptoms.

This argument is a nonstarter.  "Where conflicting evidence exists in the record, a claimant cannot successfully overturn an

26

ALJ's determination merely by referencing the evidence that supports her contentions." Juraska v. Astrue, 2011 DNH 184, 20. Here, Brown cannot overturn the ALJ's determination by arguing that her testimony at the hearing should supersede the treatment notes of her medical providers.  In fact, to the extent her testimony is inconsistent with the record evidence, it supports the ALJ's negative credibility determination.  See Ford v. Barnhart, 2005 DNH 105, 18; SSR 96-7p, 1996 WL 374186, at *5 ("One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record.").

Brown also attacks the ALJ's credibility determination for "downplay[ing]" her regression after a sexual assault in June 2012.  Brown argues that although the ALJ acknowledged the assault and her subsequent regression, the ALJ "significantly downplayed" the assault by determining that "she returned to an active life within a few weeks following the assault."  Doc. No. 7 at 7-8.  She further argues that the ALJ ignored an August 2012 phone call she made to her treatment provider in which she reported that she had been evicted for stealing and had been suicidal.  Id. at 7.

Despite Brown's argument to the contrary, the ALJ's credibility determination is supported by substantial evidence.

27

"Assessment of the credibility of an individual's statements about . . . [her] symptoms and about the effect the symptoms have on  . . . her ability to function must be based on a consideration of all the evidence in the case record." SSR 96-7p, 1996 WL 374186, at *5; see also 20 C.F.R. § 404.1529(c)(1). Here, the ALJ considered all the evidence in the case record, even the evidence about the sexual assault in June 2012 about which Brown complains.  Specifically, he wrote:

> The claimant was showing great progress over the spring and early summer of 2012 . . . .  However, she regressed somewhat in June 2012 following a sexual assault, and exhibited some decline in her functioning with increased symptoms of depression and anxiety.  However, with support from her mother, she was able to get through the trauma and return to her active life within a few weeks.  In fact, she reported between June and August 2012 that despite feelings of depression and other mild symptoms, she was nevertheless keeping busy, exercising by going for walks, having friends over to her apartment, and going out with her boyfriend to various places and doing outdoor activities such as hiking.

Tr. at 19 (citations omitted).  The ALJ cited to treatment notes from Ms. Huebel and from Ms. LeMay to support his findings.  The ALJ also confronted the evidence of Brown's two reported incidents of petty theft, but ultimately concluded that she "is generally able to control these urges."  Tr. at 19.  Therefore, I find that the ALJ's credibility determination is supported by substantial evidence.

28

**B.**   **Dr. Maguire's Opinions**

Brown argues that "the ALJ chose to ignore" the opinions of her treating psychiatrist, Dr. Maguire.  She argues that Dr. Maguire's opinions show that "she has severe mental impairments, in addition to exertional and nonexertional impairments and marked restrictions and that she is unable to work and disabled within the meaning of the [Social Security] Act."  Doc. No. 7 at 13.

Generally, the ALJ must give controlling weight to a treating source's opinion if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record."  20 C.F.R. § 404.1527(c)(2) (2014).  If, however, the ALJ finds that the treating physician's opinion is inconsistent with other substantial evidence in the record, the ALJ will instead consider the treating physician's opinion along with the other medical opinions in the record, weighted according to certain factors, including: the length, nature, and extent of the source's relationship with the claimant; the supportability of the opinion; the consistency of the opinion with the record as a whole; the source's specialization; and any other factors which tend to support or refute the opinion.  See 20 C.F.R. § 404.1527(c).

29

1.   August 2011 Opinion

The ALJ accorded "little weight" to Dr. Maguire's August 2011 opinion.  That opinion states that Brown's symptoms have a "moderate" effect on her functioning daily activities, social interactions, and stress reaction, and a "marked" effect on her task performance.  Tr. at 387.

Dr. Maguire's August 2011 opinion does not qualify for the deference given to "treating" physicians.  "Treating" sources are given more weight because:

> [they] are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(c)(2).  At the time of his August 2011 opinion, Dr. Maguire had only examined Brown on one occasion, and therefore his perspective does not have the same value as a "treating" physician contemplated by the regulations.  See id. Instead, the ALJ appropriately considered Dr. Maguire's August 2011 opinion as an "examining" source opinion.  See 20 C.F.R. § 404.1527(c)(1).

The ALJ properly considered the regulatory factors in determining what weight to accord Dr. Maguire's August 2011 opinion.  The regulations state that the ALJ should consider the

physician's relationship to the claimant (treatment, examining, or other); the supportability of the opinion; the consistency of the opinion; the source's specialization; and any other factors that tend to support or refute the opinion.  20 C.F.R. § 404.1527(c).  The ALJ need not recite every factor considered.  Phaneuf v. Colvin, 2014 DNH 145, 13.  Here, the ALJ properly considered Brown's response to treatment as an "other" factor that tends to refute Dr. Maguire's August 2011 opinion.  See 20 C.F.R. § 404.1527(c)(6).

Substantial evidence supports the ALJ's finding that Brown's condition improved in the months subsequent to Dr. Maguire's first opinion and therefore that opinion was not representative of her functioning throughout the adjudicatory period.  For example, in July 2011, following her hospitalization, she reported, "[t]his whole process has been so overwhelming for me."  Tr. at 378.  Dr. Maguire's August 2011 examination notes indicate that Brown was still "working on medication management" with Nurse Drake and his opinion stated that she was "new to treatment."  Tr. at 376, 387.  By contrast, by late 2011 and early 2012, Brown generally reported that her medications were working well to control her symptoms.  For example, on September 12, 2011, her therapist noted that Brown "has been feeling much better."  Tr. at 570.  Similarly, on

31

April 12, 2012, Brown reported "that she has been doing very well (8:10 with 10 as optimal), and does not have distressing symptoms related to her illness."  Tr. at 581.

The ALJ also noted "some inconsistency" in the opinion because Dr. Maguire's indicated that Brown had "moderate to marked limitations in concentration, persistence, and pace, yet found that the claimant would be able to manage her own benefits, if awarded."  Tr. at 22.

Therefore, the ALJ did not err in according "little weight" to Dr. Maguire's August 2011 opinion.

2.  January 2012 Opinion

The ALJ accorded "some weight" to Dr. Maguire's January 2012 opinion.[13]  That opinion states that Brown was "Moderately Limited" in activities involving "UNDERSTANDING AND MEMORY," but "Markedly Limited" in most activities involving "SUSTAINED CONCENTRATION AND PERSISTENCE" and "SOCIAL INTERACTION."  Tr. at 397-98.

The ALJ stated that Dr. Maguire had a "treating relationship" with Brown by the time of his January 2012 opinion.  Tr. at 22.  Accordingly, his opinion is entitled to

---

[13] I note that the record does not indicate whether Dr. Maguire saw Brown on more than one occasion by the time of his January 2012 opinion.  See supra note 10.  Nonetheless, the ALJ chose to consider this opinion as a treating source opinion, and neither party has argued this issue.

"controlling weight" unless it is not well-supported by objective medical evidence or it is inconsistent with other substantial evidence in the record.  20 C.F.R. § 404.1527(c)(2). The ALJ's decision "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."  SSR 96-2P, 1996 WL 374188, at *5 (July 2, 1996).

Here, the ALJ noted that the "marked impairments" listed in Dr. Maguire's opinion were inconsistent with his own treatment notes.  Tr. at 22.  Specifically, Dr. Maguire's opinion states that Brown had marked impairments in almost all areas of sustained concentration and persistence.  By contrast, the ALJ noted that Dr. Maguire's treatment notes "do not reflect even a single observation of poor concentration or increased distractibility."  Tr. at 22.  In fact, in each of Dr. Maguire's mental status examinations of Brown, he noted that she was seated, calm, and cooperative.  Tr. at 580, 586, 633, 648.

Additionally, the ALJ noted that the "marked impairments" in Dr. Maguire's opinion were inconsistent with Brown's testimony.  Tr. at 22.  His opinion stated that Brown's "ability

to get along with coworkers or peers without distracting them or exhibiting behavioral extremes" was "Markedly Limited."  At the hearing, however, Brown testified that she generally got along with her coworkers and bosses.  Tr. at 61.

Therefore, the ALJ did not err in according "some weight" to Dr. Maguire's January 2012 opinion.

## C.    <u>Brown's Other Arguments</u>

Brown makes a number of other undeveloped claims of error throughout her brief.  For example, in the conclusion of her brief — for the first time — Brown argues that "the ALJ did not consider the vocational expert testimony which supports that the plaintiff is disabled" and that the Commissioner did not meet her burden to prove that there are jobs available that Brown can perform.  These statements are provided without any further argument, citation to the record, or case citation.

I will not address these superficial arguments or the other one-sentence statements like them in Brown's motion.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.").

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, I grant the Commissioner's motion to affirm (Doc. No. 14) and deny Brown's motion to reverse (Doc. No. 7).  The clerk is directed to enter judgment accordingly and close the case.

SO ORDERED.


<u>/s/Paul Barbadoro</u>
Paul Barbadoro
United States District Judge

November 24, 2014

cc:   Christine Woodman Casa
      Robert J. Rabuck